**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| YEVONNE POWERS, *individually and on behalf of others similarly situated,* | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| v. | ) | CLASS-ACTION |
| | ) | |
| LIBERTY MUTUAL INSURANCE COMPANY, | ) | **Jury Trial Demanded** |
| Defendant. | ) | |

**COMPLAINT**
**CLASS ACTION**

1. Liberty Mutual Insurance Company ("Liberty" or "LiMu") is one of the nation's largest automobile insurance companies. To grow its business, Liberty engages in aggressive telemarketing, making tens of thousands of telemarketing "robocalls" and text message.

2. Liberty uses robocalls for this outreach instead of live operators, because it does not know if the people it is calling are truly interested in its products and services.

3. Liberty does not know if its call recipients are truly interested because it purchases phone numbers as part of "leads" from "Lead Aggregators," which are companies that purchase and sell marketing leads.

4. Lead Aggregators typically purchase the leads they sell to Liberty from "Lead Generators," which are companies that operate websites where consumers may enter their personal information, purportedly to request information which – unbeknownst to the consumer – is shared with myriad entities, each of which claim to have "prior express written consent" to robocall the consumer.

5. The Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, requires that a caller and seller like Liberty obtain consent from the consumer before they make

prerecorded message “robocalls” to a consumer’s cellular or residential phone.

6. LiMu purports to maintain evidence of consent for the robocalls it makes.

7. However, sometimes LiMu’s “consent” arises from a website that asks consumers to agree to receive calls from the lead generator’s “Marketing Partners” or “Industry Partners,” or similar, where such “partners” number in the thousands and are listed on a separate web page.

8. And because callers like Liberty usually have no relationship with the Lead Generators that originate the leads, there exists no meaningful way for the consumer to make the calls stop.

9. Even if a consumer demands that calls cease during every call received, the Lead Aggregator and/or Lead Generator can keep selling the lead over and over to different entities that purport to have consent.

10. Further, in relying on these deficient leads, callers – including Liberty – also frequently fail to scrub their call lists to avoid initiating telephone solicitations to residential phone numbers on the National Do Not Call Registry (“DNCR”), in violation of the TCPA’s prohibition against such, 47 C.F.R. § 64.1200(c)(2). This happened in Plaintiff’s case, as well.

11. Given the automated nature of robocall violations, and the cost of litigation as compared with individual recoveries, a class action is the only practicable means of obtaining redress for Liberty Mutual’s illegal, prerecorded-voice and DNCR-violative calls, and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

**BACKGROUND ON THE TCPA**

12. Advancements in telephone dialing technology by the 1980s and 90s made reaching a large number of consumers by telephone easier and more cost-effective. However,

this technology has also brought with it an onslaught of unsolicited robocalls, spam text messages, and junk faxes that intrude on individual privacy and waste consumer time and money. As a result, the federal government and numerous states have enacted legislation to combat these widespread telecommunications abuses. As Congress recognized:

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes…. Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

Pub. L. No. 102-243, 105 Stat. 2394 § 2(6, 12) (1991).

13. As is relevant here, federal law under the TCPA prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using … an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA provides for injunctive relief and the greater of actual damages or $500 per violation, which can be trebled where the statute was "willfully or knowingly" violated. 47 U.S.C. § 227(b)(3).

14. An affirmative defense is available if before the calls the seller (here, Liberty) first obtains "express consent."

15. In *In re Urth Access, LLC*, EB File No. EB-TCD-22-34232, 2022 WL 17550566, at *6 (FCC Dec. 8, 2022), the FCC considered a "consent farm" scheme (substantially similar to that which Liberty relies upon with its lead generators), and found Urth Access' consent procedures wanting:

> … for telemarketing calls, the Commission requires the caller to provide a "clear and conspicuous disclosure" when obtaining prior express written consent.
>
> [Urth Access'] websites included TCPA consent disclosures whereby the consumer agreed to receive robocalls from "marketing partners."

> These "marketing partners" would only be visible to the consumer if the consumer clicked on a specific hyperlink to a second website that contained the names of each of 5,329 entities.
>
> We find that listing more than 5,000 "marketing partners" on a secondary website is not sufficient to demonstrate that the called parties consented to the calls from any one of these "marketing partners."

(paragraph breaks supplied; emphasis added).

16. The FCC has subsequently reaffirmed that placing a company's name in a list of thousands on a separate webpage is "abusive" to consumers, and does not constitute valid consent. *In re TCPA: Closing the Lead Generator Loophole Order*, __ FCC Rcd. __, 2023 WL 8826682, ¶¶ 30-53 (Dec. 18, 2023), available at: https://www.fcc.gov/document/fcc-closes-lead-generator-robocall-loophole-adopts-robotext-rules (the "Lead Generator Loophole Ruling").

17. The Eleventh Circuit invalidated certain portions of the *Lead Generator Loophole Order*. In doing so, however, the Eleventh Circuit characterized the facts of *In re Urth Access* as "egregious." *Ins. Mktg. Coal. Ltd. v. Fed. Commc'ns Comm'n*, 127 F.4th 303, 317 (11th Cir. 2025). LiMu's "consent" practices closely resemble those the Eleventh Circuit criticized, and are egregious.

18. The TCPA's DNCR rule also provides: "No person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). The TCPA provides for injunctive relief and the greater of actual damages or up to $500 per violation, which can be trebled where the statute was "willfully or knowingly" violated. 47 U.S.C. § 227(c)(5).

19. State laws also protect consumers from improper telemarketing. Relevant to Virginia consumers like Plaintiff Powers here, Virginia likewise prohibits initiating or causing to be initiated a telephone solicitation call to a telephone number on the National Do Not Call Registry. Va. Code § 59.1-514.B. Such law also provides for damages, injunctive relief, and/or attorneys' fees and costs. Va. Code § 59.1-515.

**PARTIES**

20. Plaintiff Yevonne Powers is a natural person who resides in Bedford County, Virginia. Ms. Powers received the calling at issue in this case on her cell phone, for which she is the residential subscriber. Plaintiff is the subscriber to her phone number, which is connected to a personal rather than business account with her carrier. Plaintiff uses her phone for personal rather than business purposes.

21. Plaintiff's subject residential phone number has been on the National Do Not Call Registry since approximately 2006.

22. Defendant Liberty Mutual Insurance Company is a Massachusetts corporation headquartered at 175 Berkeley Street, Boston, MA 02116.

**JURISDICTION AND VENUE**

23. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 with respect to Plaintiff's TCPA claims. *Mims v. Arrow Financial Services, Inc.*, 132 S. Ct. 740 (2012).

24. The Court has supplemental jurisdiction over Plaintiff's Virginia state law claims pursuant to 28 U.S.C. § 1367, because they are based on the same calls and so related to Plaintiff's federal TCPA claims that they form part of the same case or controversy.

25. The Court also has Class Action Fairness Act jurisdiction because, on information

and belief (including based on the automated nature of Liberty Mutual's calls and its size as one of the largest insurance companies in the country), the nationwide class is comprised of at least ten thousand members, at least one class member is a citizen of a different state from where any Defendant is a citizen, and because the aggregate damages exceed $5,000,000, exclusive of fees, costs and interest.

26. Venue is appropriate in this District because Liberty is at home in Massachusetts, and a substantial part of the facts and circumstances leading up to the robocalls complained of herein occurred in this District.

**FACTS**

27. Liberty Mutual is engaged in a prolific prerecorded-voice call campaign to American consumers, robocalling many millions of consumers' residential and cellular telephones, without proper consent, over the course of several years.

28. Instead of obtaining marketing leads directly from consumers, Liberty purchases the phone numbers it robocalls from Lead Aggregators, who themselves purchased the leads from still-further-removed, third-party Lead Generators.

29. Lead Generators generally obtain their leads from interactions on websites where someone enters their personal information and clicks a button to receive information.

30. The vast majority of the websites of the Lead Generators whose leads Liberty purchases purport to obtain consent for thousands of companies at once through a single click of the mouse. This process is demonstrated below.

31. What is more, the list of companies that the consumer purportedly "consented" to receive calls from do not appear on the web page the consumer typically visits. Instead, the list appears in a hyperlink to "Industry Partners," "Marketing Partners," "Provider Network" or

similar, which is not clearly and conspicuously presented to the consumer.

32. Lead Generation websites' references to "Industry Partners," "Marketing Partners" or "Provider Network" in the context of Liberty Mutual is misleading, because Liberty generally has no relationship (or "partnership") with the lead generators, which originate the marketing leads it robocalls.

33. Liberty purchased a lead for Plaintiff Yevonne Powers on or about November 4, 2021, from Lead Aggregator All Web Leads.

34. This lead originated from a website called ratemarketplace.com, which in 2021 was operated by lead generator Plateau Data Services, LLC.

35. Upon information and belief, LiMu purchased more than 25,000 leads from Plateau Data Services, LLC on or after November 5, 2021. Upon information and belief, LiMu attempted to robocall and text more than 20,000 of those leads.

36. In 2021, the last page of RateMarketplace.com's questionnaire looked like this:



96% complete

Great News! Your results are ready to view.

First Name*

**********

Last Name*

**********

Email*

**********

Phone*

**********

Street Address*

**********

Bedford, VA 24523 Change

SEE MY RESULTS!

By clicking the "See My Results" button above, you are providing your electronic signature in which you consent, acknowledge and agree to the following: (a) our Terms of Service and Privacy Policy, including our arbitration provision. (b) You are providing express written consent to share your information with RateMarketplace, and up to 5 Industry Partners, or authorized third parties calling on our, or their behalf who may contact you for marketing purposes. (c) You give consent (consent not required as a condition to purchase a good/service) for them/us to contact you through automated means at the phone number(s) and at the email address you have provided (e.g. automatic telephone dialing system, text, artificial or pre-recorded messaging) via telephone, mobile device (including SMS and MMS) and/or email, even if your telephone number is currently listed on any state, federal or corporate Do Not Call registry. You may opt-out from SMS or Text messages at any time by replying STOP. Data and Msg rates may apply. As an alternative, you may contact us by email at: customercare@ratemarketplace.com. You understand that you may revoke this consent at any time.

37. The portion of this web page that concerns "consent" for "Industry Partners" is obfuscated. For example:

a. "Consent" is in small print as compared to other portions of the web page.

b. The "consent" portion of the disclosures at the bottom of the page is buried in a litany of other disclosures, which makes it very difficult for a consumer to notice, let alone meaningfully agree.

c. The "button" that the consumer presses to "consent" says "SEE MY RESULTS" which shifts the consumer's focus to learning what kind of deals they might receive (i.e. marketing), instead of referring to the TCPA-required disclosure that might read, "I CONSENT TO RECEIVE ROBOCALLS FROM LIBERTY MUTUAL." To be clear, the above proposed disclosure is not offered to show what would be sufficient to satisfy consent; it is offered to demonstrate how "SEE MY RESULTS" obfuscates the TCPA-required consent portion of the web page.

d. Perhaps most importantly, LiMu is not mentioned at all on this web page.

e. What is more, the hyperlink "5 Industry Partners" no longer links to any web page that could have been posted in 2021. However, the current hyperlink sends one to https://autogo2.insurancespecialists.com/ServicePartners.html, which includes a list of approximately 7,000 entities. Upon information and belief, based upon the current linked page and industry practice, if there was a valid web page linked at the time of the calls at issue herein, it similarly listed thousands of "Industry Partners."

38. Upon information and belief, based upon industry practice, Plateau Data Services, LLC maintained a consistent "consent" disclosure text-block similar or identical to that which

Jornaya showed on RateMarketplace.com, for all of its lead generation websites.

39. Liberty Mutual reviews and approves each and every consent disclosure block for the leads it purchases ahead of time, to ensure that the disclosures comport with its vision of what it means to "consent" under the TCPA.

40. LiMu approved the above-quoted disclosures at RateMarketplace.com, knowingly accepted leads that originated from that website and called those leads using an automated dialing system that was programmed to play prerecorded messages when a person or voice mail answered.

41. Liberty relies upon a TCPA compliance company called Jornaya to assist in making sure it has the level of "consent" that it previously approved, to call the leads it purchases.

42. LiMu keeps track of "consent" disclosures through Jornaya.

43. Plaintiff did not provide LiMu with consent sufficient to satisfy the TCPA's consent requirements, with regard to the marketing lead that is the subject of this lawsuit.

44. Indeed, it appears that the lead upon which Liberty's consent is based is fraudulent, because the Jornaya data for the lead shows (1) that Plaintiff requested insurance information concerning either an Aston Martin DB9 or an Aston Martin Vanquish S; supercars that Powers has never owned, and (2) the IP address for the subject lead traces to the Atlanta, Georgia area, whereas Plaintiff lives in rural Virginia.

45. Liberty has a history of purchasing and robocalling telephone numbers based upon fraudulent leads, and blaming the consumer when it comes to litigation.

46. Indeed, Liberty sued All Web Leads, the lead aggregator that it purchased the subject lead in this case, on September 12, 2025, *Liberty Mutual Ins.Co. v. All Web Leads, Inc.*,

1:25-cv-12565 (D. Mass.), alleging that the lead All Web Leads sold LiMu that was at issue in *Fralish v. Liberty Mutual Ins. Co.*, 22-cv-00336 (N.D. Ind.) and *Ward v. Liberty Mutual Ins. Co.,* 1:24-cv-10526 (D. Mass), were invalid, and All Web Leads' sales of data to Liberty was unfair and deceptive.[1]

47. But during the *Fralish* litigation, Liberty focused its efforts on trying to paint the Plaintiff to look like a fraudster in order to conceal the truth that LiMu knew all along that it was All Web Leads that defrauded LiMu by selling it an invalid lead.

48. Liberty's internal knowledge that the lead was fraudulent did not dissuade it from attacking Plaintiff John Fralish in the litigation, and falsely painting him as a fraudster to gain advantage in the litigation. See, e.g. Dkt. 59 at 1 ("Liberty Mutual's investigation to date has revealed evidence suggesting that Plaintiff (or someone acting on his behalf) is manufacturing TCPA claims, including the claims asserted in this case, by voluntarily providing his phone number and using deceptive tactics to make would-be defendants call them and then sue them for making the requested calls."); also Dkt. 143 at 16 (opposing motion for leave to amend by referring to the possibility that Fralish "committed a fraud on the Court").

49. Liberty Mutual has been sued in the past for similar telemarketing violations, and its executives and legal teams were on actual notice that its practices were resulting in nonconsensual calls to consumers' phones like those alleged here. *See, e.g., Johansen v. Liberty Mutual Group Inc.*, No. 1:15-cv-12920 (D. Mass.) (Liberty Mutual settled TCPA do-not-call violation claims with consumer, and then tried to seek indemnity from its third-party vendors); *Smith v. Liberty Mutual Ins. Co.*, No. 1:20-cv-11583 (D. Mass.) (consumer sued Liberty Mutual for alleged TCPA robocall violations). Nonetheless, Liberty Mutual has continued to reap the

[1] The indemnity complaint is heavily redacted. Plaintiff relies only on what is publicly legible.

benefits of nonconsensual prerecorded calls, choosing profits over consumer privacy and safety.

50. Plaintiff and the other class members have been damaged by Liberty Mutual's calls. Their seclusion and privacy was improperly invaded, Liberty Mutual's calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls. Liberty Mutual's calls were annoying and a nuisance, and wasted the time of Plaintiff and the class. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (finding TCPA violations present concrete injury-in-fact sufficient for Article III standing); *Mims v. Arrow Fin. Servs., Inc.*, 132 S. Ct. 740 (2012) (noting congressional findings of consumer "outrage" as to autodialed and prerecorded-voice calls).

## CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action under Federal Rules of Civil Procedure 23(b)(2) and (b)(3), on behalf of classes consisting of:

> **Robocall Class**: All cell phone subscribers in the United States whose telephone number Liberty Mutual, or some third party on its behalf, called using an artificial or prerecorded voice from four years prior to the filing of this complaint until the date of class certification, where the originating Lead Generator website did not mention Liberty in the TCPA disclosures Jornaya logged applicable to the alleged lead.
>
> Plaintiff alleges a subclass of persons whose leads originated with Plateau Data Services, LLC, or RateMarketplace.com before December 31, 2023.
>
> **National Do Not Call Registry ("DNCR") Class:** All persons within the United States whose residential cellular or landline numbers Liberty Mutual or someone on its behalf called from four years prior to the filing of this complaint through the date of class certification, more than once in a 12-month period for purposes of encouraging the purchase of Liberty's consumer (i.e. non-commercial) products or services, where (1) the person's phone number had been registered with the National Do Not Call Registry for more than 31 days at the time of the call; and (2) Liberty's records do not reflect either (a) a "one-to-one" signed, written agreement between the person and Liberty which states the consumer agrees to be contacted by Liberty at the phone number called, without a subsequent do-not-call request.

52. Plaintiff is a member of each class, and is also a member of the subclass.

53. There are more than 10,000 persons in the Robocall Class.

54. There are more than 10,000 persons in the Robocall subclass.

55. There are more than 10,000 persons in the DNCR class.

56. The Telemarketing Sales Rule ("TSR") 16 C.F.R. § 310.5, requires that Liberty Mutual maintain data concerning each telemarketing call it makes, including whether a prerecorded message was played 16 C.F.R. § 310.5(a)(2)(vi), call disposition, 16 C.F.R. § 310.5(a)(2)(x), specific records concerning any Established Business Relationship that Liberty might assert 16 C.F.R. § 310.5(5), and very specific records of any consent LiMu may claim, 16 C.F.R. § 310.5(8).

57. Upon information and belief, Liberty complied with the recordkeeping requirements of 16 C.F.R. § 310.5, and has access to 5 years of such records. 16 C.F.R. § 310.5(a).

58. Alternatively, to the extent discovery shows that LiMu did not comply with the recordkeeping requirements of 16 C.F.R. § 310.5, Plaintiff intends to seek an adverse inference and/or other form of appropriate relief.

59. Common questions of law or fact exist as to all members of the classes, which predominate over any questions solely affecting any individual member, including Plaintiff. Such questions common include but are not limited to:

a. Whether the calls to Plaintiff and the Robocall Class were made using an artificial or prerecorded voice as such terms are defined or understood under the TCPA;

b. Whether it was legally possible for LiMu to obtain TCPA consent sufficient to

make the calls alleged herein to Plaintiff and the class, where LiMu is not identified in the purported consent-providing disclosure statements;

c. Whether Liberty had established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the TCPA's National Do Not Call Registry regulations;

d. Damages, including whether any violations were performed willfully or knowingly, such that Plaintiff and the other class members are entitled to treble damages under 47 U.S.C. § 227(b)(3) (robocall claims) and § 227(c)(5) (DNCR claims).

60. Plaintiff's claims are typical of the claims of the other members of the classes. The factual and legal bases of Liberty Mutual's liability to Plaintiff and the other class members are the same: Defendant violated the TCPA by causing nonconsensual, artificial- or prerecorded-voice telemarketing calls to be made to the cellular telephone number of each member of the Robocall Class, and by causing telephone solicitations to be made to the residential telephone subscribers of the DNCR Class despite their phone numbers' registration on the National Do Not Call Registry.

61. Plaintiff will fairly and adequately protect the interests of the classes. Plaintiff has no interests that might conflict with the interests of the classes. Plaintiff is interested in pursuing her claims vigorously, and she has retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

62. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously,

efficiently, and without the duplication of effort and expense that numerous individual action would entail. There are, on information and belief, thousands of members of each class, such that joinder of all members is impracticable.

63. No difficulties are likely to be encountered in the management of this action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

64. Defendant has acted and failed to act on grounds generally applicable to Plaintiff and the other members of the classes, thereby making relief appropriate with respect to the classes as a whole. Prosecution of separate actions by individual members of the classes, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the classes that would establish incompatible standards of conduct.

65. The identity of the classes are, on information and belief, readily identifiable from Liberty Mutual's or its vendors' records.

## COUNT I
## Robocall TCPA Violations

66. Plaintiff re-alleges and incorporates all prior allegations. Plaintiff brings this count on behalf of herself and the Robocall Class.

67. It is a violation of the TCPA to call cellular or residential telephones and play an artificial or prerecorded voice.

68. Liberty Mutual initiated or caused to be initiated calls to the cellular and residential telephone numbers of Plaintiff and the other members of the Robocall Class defined above using an artificial or prerecorded voice.

69. Liberty made these calls were made even it did not have sufficient consent under

the TCPA.

70. These calls and violations were willful or knowing. Liberty knew at all times there was TCPA risk in using robocalls for marketing purposes, and continues to use such with "eyes wide open."

71. Liberty specifically approved the consent practices challenged here, and directed that robocalls be made to the cell and residential phone numbers of the Plaintiff and the class.

72. To the extent that some of the calls to Plaintiff and the Robocall Class were made by vendors of Liberty Mutual such as robodialing company Drips, LLC, Liberty Mutual is liable for those calls, too.

73. Upon information and belief, Liberty has not altered the conduct complained of herein since *Fralish* was filed. Such obstinance warrants both (a) imposition of an injunction prohibiting Liberty from using robocalls until it shores up its consent policies and practice, and (b) treble damages.

74. As a result of Liberty's conduct and pursuant to Section 227(b)(3) of the TCPA, Plaintiff and the other members of the Robocall Class were harmed and are each entitled to a minimum of $500 and maximum of $1,500 in damages for each violation; treble damages if violations are found to have been willful or knowing.

WHEREFORE, Plaintiff Yevonne Powers, individually and on behalf of the Robocall Class, respectfully requests that the Court enter judgment against Defendant Liberty Mutual Insurance Company for:

A. Certification of the Robocall Class as alleged herein, and appointment of Plaintiff as class representative and her attorneys as class counsel;

B. Damages, pursuant to 47 U.S.C. § 227(b)(3);

C. An injunction:

- prohibiting Liberty Mutual from making – or accepting business derived from – prerecorded message calls, unless they have first obtained the express consent of the subscriber before making the call;

- Requiring Liberty Mutual to engage a Court-approved, independent auditing company to (a) investigate all allegations of TCPA violations, and (b) audit no less than 10% of Liberty's outbound calls – including calls originating from lead generators – to ensure that Defendants had proper consent for robocalls, and (c) report the results of the above investigations to the Court and Plaintiff's counsel on a quarterly basis for no less than five years.

- Requiring Liberty Mutual to include a working, automated IVR opt-out mechanism at the beginning of any and all prerecorded-voice calls.

D. Attorneys' fees and costs, as permitted by law; and

E. Such other or further relief as the Court deems just and proper.

## COUNT II
## National Do Not Call Registry TCPA Violations

75. Plaintiff re-alleges and incorporates all prior allegations. Plaintiff brings this count on behalf of herself and the DNCR Class.

76. It is a violation of the TCPA to initiate any telephone solicitation to a residential telephone subscriber who has registered his or her residential landline or cellular telephone number on the National Do Not Call Registry. 47 C.F.R. § 64.1200(c)(2).

77. Liberty Mutual violated the TCPA by initiating or causing to be initiated multiple telephone solicitations to Plaintiff and the other members of the DNCR Class in a 12-month period, despite those persons' registration of their telephone numbers on the National Do Not Call Registry.

78. Liberty was not entitled to any "established business relationship," "prior express invitation or permission," or other defense that might privilege them to make these calls.

79. These calls and violations were willful or knowing. Liberty knew at all times that

there was TCPA risk in using robocalls for marketing purposes, and with "eyes wide open" specifically approved the consent verbiage challenged here, and directed that robocalls be made to the cell and residential phone numbers of the Plaintiff and the class.

80. To the extent that some of the calls to Plaintiff and the Robocall Class were technically placed by vendors of Liberty Mutual such as robodialing company Drips, LLC, Liberty Mutual is directly liable for those calls because it specifically directed that such calls be initiated to specific telephone numbers using prerecorded messages.

81. As a result of Liberty's violations of the TCPA's National Do Not Call Registry regulations, Plaintiff and the other members of the DNCR Class seek an injunction and up to $1,500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

82. Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

83. To the extent Liberty did not physically "initiate" the calling at issue itself, Liberty is nonetheless liable based on theories of direct liability, actual authority, apparent authority, and ratification (among others), for these calls were made on their behalf.

WHEREFORE, Plaintiff Yevonne Powers, individually and on behalf of the DNCR Class, respectfully requests that the Court enter judgment against Defendant Liberty Mutual Insurance Company for:

A. Certification of the DNCR Class as alleged herein, and appointment of Plaintiff as class representative and her attorneys as class counsel;

B. Damages, pursuant to 47 U.S.C. § 227(c)(5);

C. Injunctive relief, pursuant to 47 U.S.C. § 227(c)(5), aimed at preventing Defendant and its agents and (sub)vendors from violating the TCPA in the

future;

D. An injunction prohibiting Defendant from relying upon consent derived from third-parties such as lead generators, to try to establish an Existing Business Relationship, as well as a declaration to this effect, too;

E. Attorneys' fees and costs, as permitted by law; and

F. Such other or further relief as the Court deems just and proper.

## COUNT III
## National Do Not Call Registry VTPPA Violations

84. Plaintiff re-alleges and incorporates all prior allegations. Plaintiff brings this count on behalf of herself, individually.

85. The Virginia Telephone Privacy Protection Act ("VTPPA"), Va. Code § 59.1-514, provides that "[n]o telephone solicitor shall initiate, or cause to be initiated, a telephone solicitation call to a telephone number on the National Do Not Call Registry maintained by the federal government pursuant to the Telemarketing Sales Rule, 16 C.F.R. Part 310, and 47 C.F.R. § 64.1200."

86. Va. Code § 59.1-515 provides that any natural person who is aggrieved by a violation of the VTPPA shall be entitled to initiate an action against any responsible person to enjoin such violation and to recover from any responsible person damages in the amount of $500 for a first violation, $1,000 for a second violation, and $5,000 for each subsequent violation, or up to $5,000 for all such violations where willful, at the Court's discretion.

87. Plaintiff seeks the maximum possible statutory damages pursuant to Va. Code § 59.1-515, for each call Liberty caused to be made to her cell phone, as well as injunctive relief and reasonable attorneys' fees and costs.

88. Because such violations were willful, Plaintiff is entitled to maximum statutory

damages of $5,000 per call Liberty made to her phone, pursuant to Va. Code § 59.1-515.

WHEREFORE, Plaintiff Yevonne Powers, individually, respectfully requests that the Court enter judgment against Defendant Liberty Mutual Insurance Company for:

A. Damages, pursuant to Va. Code §§ 59.1-515.A-B;

B. Injunctive relief, pursuant to Va. Code § 59.1-515.D, aimed at preventing Defendant and its agents and (sub)vendors from violating the TCPA in the future;

C. Attorneys' fees and costs, pursuant to Va. Code § 59.1-515.C; and

D. Such other or further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Dated: November 5, 2025

Respectfully submitted,

KIMMEL & SILVERMAN, PC

By: *Craig Thor Kimmel*
Craig Thor Kimmel, Esq.
30 East Butler Ave.
Ambler, PA 19002
Phone: (215) 540-8888 x 148
Facsimile: (877) 788-2864
Email: kimmel@creditlaw.com
teamkimmel@creditlaw.com

BURKE LAW OFFICES, LLC

*/s/ Alexander H. Burke*
Alexander H. Burke (*phv* forthcoming)
909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com
*Counsel for Plaintiff*